UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| E.M.J., by and through his parents, | ) | |
| Next Friends M.J. & D.J., | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:18-CV-45-REW-EBA |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| GARRARD COUNTY BOARD OF | ) | |
| EDUCATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

These are the allegations: During 4th, 5th, and 6th grade, first one and then several male classmates harassed EMJ, a disabled child.[1] In middle school, two boys, not content with lesser torments, lewdly attacked EMJ in a bathroom stall. EMJ's parents, MJ & DJ, believed their son's school was not doing enough to protect him. Ultimately, and on a pediatrician's advice, they pulled EMJ out of school. This suit followed.

I.      BACKGROUND

The Court takes the facts and record in Plaintiff's favor: In elementary school, one child, CD, mistreated EMJ, an intellectually disabled child, on roughly ten alleged occasions. DE 63-3 at 5–11 (EMJ Dep.).[2] The 4th and 5th grade events included name-calling, minor property

---

[1] Consistent with the parties' treatment, the Court references the involved adolescents (and EMJ's parents) by their initials. The Court omits unnecessary punctuation for such initials.

[2] For subsequent references, the Court substitutes deposition page citations for docket page pincites. All relevant deposition excerpts are found in the DE 63 exhibit suite. *See* DE 63 (Notice of Filing). For record clarity, the Court notes that (as the underlying content makes clear) the defense mistakenly attached DJ's deposition coversheet to EMJ's deposition and vice versa. *Compare* DE 63-3, *with* DE 63-4.

destruction, and three instances of (at least possible) physical contact—during 4th Grade CD once kicked, punched, and threw a basketball at EMJ. *Id.* EMJ reported some, but not all of these events to his teacher, Kim Young. *Id.* The timing, sequence, and frequency of the events are unknown on this record.

During 6th grade, at a distinct school in the District, three boys, JC, DM, and MS, picked up where CD left off. [All three children had cognitive disabilities. *See* Lamb Dep. at 82–83; Brogli Dep. at 34–35]. The trio cursed EMJ on multiple occasions. EMJ Dep. at 22–23. But with DM and MS, the attacks intensified during four subsequent events. *Id.* at 24–28, 30–40. Most relevant, for current purposes, was DM and MS's alleged assault on EMJ in a restroom. *Id.* Among other alleged attacks, as EMJ now tells it, MS touched EMJ's genitals and DM put a finger in EMJ's rectum. *Id.* Upon receiving EMJ and DJ's (somewhat sanitized) report of this event, a week after the fact, the middle school investigated. Lamb Dep. at 47–49, 51–52, 60–61. Video surveillance footage, which did not show EMJ in the location with the claimed perpetrators, failed to substantiate EMJ's claims. *Id.* at 42. Nonetheless, the school arranged for EMJ's use of a private bathroom. EMJ Dep. at 42. When DM persisted with non-physical harassment, on one other occasion, the school permanently separated the boys. Lamb Dep. at 81. Following a final verbal bullying incident, EMJ's parents, based on a pediatrician's report as to stress the recent bullying was causing EMJ, removed him from school. DE 60-3 (Letter); Lamb Dep. at 103.

Plaintiff claims that Defendant Garrard County Board of Education ("Garrard" or the "Board") was deliberately indifferent to disability-driven peer bullying of EMJ in violation of 28

U.S.C. § 1983, § 504 of the Rehabilitation Act of 1974,[3] and KRS Chapter 344[4] (Counts II, III & IV). *See* DE 9 (Complaint) at 9–11. Plaintiff also claims that EMJ's elementary school principal, Tracie Bottoms, 4th & 5th grade teacher, Kim Young, 6th grade teacher, Elizabeth Brogli, middle school vice principal, Kia Lamb, and the 2017-acting Garrard Superintendent, Corey Keith, negligently failed to protect EMJ from harm (Count I). *See id.* at 9. Defendants seeks summary judgment on all of EMJ's claims. *See* DE 53 (Motion). The matter is fully briefed and ripe for review. *See* DE 60 (Response) & DE 62 (Reply).

## II.  STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings,

---

[3] In relevant part, § 504 bars disability discrimination by recipients of federal funding. *See* 29 U.S.C. § 794(a).

[4] The complaint cites KRS 344.130 as prohibiting "discrimination by a public accommodation due to one's disability." DE 9. Not so. KRS 344.130 defines "place of public accommodation," but KRS 344.120 provides the substantive prohibition and (presumably) the foundation for Plaintiff's Count IV. The statute, in relevant part, bars denial of "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation . . . on the ground of disability[.]" KRS 344.120.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

## III.    ANALYSIS

### A.  Rehabilitation Act & KRS 344.120

Initially, neither § 504 nor KRS 344.120[5] authorizes suits against individuals. *See Lee v. Michigan Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004) (§ 504 does not "impose liability upon individuals."); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997) (Generally, "an individual employee/supervisor . . . may not be held personally liable under . . . KRS Chapter 344."). EMJ does not contest this point. Thus, EMJ may bring § 504 and KRS 344.120 claims only against Board employees in their official capacity. Because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" the Court, for Rule 56 purposes,

---

[5] Defendants claim that public schools are not KRS 344.130 places of public accommodation. DE 53 at 12–13. Commonwealth appellate courts, as recently as 2018, have consistently rejected Defendant's theory. *See, e.g., Anderson v. Fayette Cty. Bd. of Educ.*, No. 2016-CA-001101-MR, 2018 WL 3006148, at *3 (Ky. Ct. App. June 15, 2018). Defendant notes that such decisions are unpublished and were not issued by "court[s] of last resort[.]" DE 62 at 7. Yet, the general rule remains: "federal courts must defer to a State court's interpretation of its own law[.]" *United States v. Miami Univ.*, 294 F.3d 797, 811 (6th Cir. 2002). At least 4 Kentucky appellate judges have signed on to an interpretation of Kentucky law that directly contradicts the defense theory. *See, e.g., K.M. ex rel. B.M. v. Fayette Cty. Pub. Sch.*, No. 2002-CA-000304-MR, 2003 WL 21771952, at *6 (Ky. Ct. App. Aug. 1, 2003). The Court, despite the absence of precedential state decisions, finds itself comity bound to follow Judge Hood's lead in applying the *K.M.* interpretation of KRS 344.130. *See R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cty., Ky.*, No. 5:09-CV-344-JMH, 2014 WL 4277482, at *11 (E.D. Ky. Aug. 28, 2014), *aff'd*, 637 F. App'x 922 (6th Cir. 2016). The defense's untested argument—inferring, from subsequent state legislative enactments, exclusion of public schools from KRS 344.130—does not turn the tide. *See* DE 53 at 13–14. KRS 344.145 prohibits gender-based discriminatory **denial** of "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations[,]" while KRS 344.555 broadly bars gender-based "discrimination under any education program[.]" The overlap is not as complete as Defendants suggest. Thus, Garrard falls within KRS 344.130's coverage.

need only analyze whether EMJ has created a triable issue as to the **Board**'s liability on Counts

III & IV. *Kentucky v. Graham*, 105 S. Ct. 3099, 3105 (1985).[6]

As to the Board, Plaintiff asserts "a disability-based peer-on-peer harassment claim." *S.S.*

*v. E. Kentucky Univ.*, 532 F.3d 445, 453 (6th Cir. 2008). Under the Sixth Circuit framework for

such claims, EMJ must show that:

> (1) he was an individual with a disability, (2) he was harassed based on his disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his education and created an abusive educational environment, (4) [the Board] knew about the harassment, and (5) [the Board] was deliberately indifferent to the harassment.

*Id.* at 454; *see also* DE 60 at 18 (EMJ advocating for a virtually identical test). The inquiry is the

same under KRS 344.120. *See R.K.*, 637 F. App'x at 925 ("We analyze claims under the Kentucky

---

[6] The Court sees no need to decide whether EMJ's claims are subject to the IDEA exhaustion requirement. *See* DE 53 at 10–12. Plaintiff claims exhaustion would be futile because "there is no relief available to him through the administrative process[.]" DE 60 at 9–10. The Sixth Circuit recognizes a futility exception in circumstances where "the condition creating the damage has ceased, and there is no equitable relief that would make [the plaintiff] whole." *See Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 918 (6th Cir. 2000). Here, EMJ does not seek any specific equitable relief, nor is there any indication that equitable relief could remedy the historical harms alleged. *See* DE 9 at 12. Further, on a physician's recommendation, DJ withdrew EMJ from Garrard in May 2017. DE 60-3 (Dr. Manning-Courtney Letter – May 10, 2017). The physician recommendation, as well as the relief sought, distinguish this matter from *Doe v. Smith*'s holding that parents may not create futility by "unilaterally placing [their child] in [a] private school." 879 F.2d 1340, 1343 (6th Cir. 1989). [Unilateral means "[o]ne-sided" or "relating to only one of two or more persons or things[.]" *Unilateral*, Black's Law Dictionary (11th ed. 2019).] The physician involvement did not, of course, render EMJ's removal a "bilateral" decision (as to case litigants); nonetheless, it provides sufficient logical distance from *Doe*'s wholly unguided placement choice. The Court also notes that, given the timeline, and assuming typical grade progression, EMJ would not now be a middle school student. Thus, even if the removal decision was, at one time, arguably unilateral, futility here arises from the march of time. In sum, the bullying complained of has ended (and, at least as previously constituted, is highly unlikely to continue) and "injunctive or other equitable relief [could not] alleviate" EMJ's alleged injuries. *Covington*, 205 F.3d at 917. Even if Plaintiff's claims would otherwise be subject to IDEA exhaustion, such administrative process would, here, be futile. *See id.* (holding exhaustion futile where "the injured child has already graduated from the special education school, his injuries are wholly in the past, and therefore money damages are the only remedy that can make him whole").

Civil Rights Act the same way we analyze claims under the [ADA and Rehabilitation Act].").

Thus, "[c]onsistent with Sixth Circuit and Kentucky practice," the Court jointly analyzes the § 504

and KRS 344.120 theories. *See H.C. v. Fleming Cty. Kentucky Bd. of Educ.*, No. CV 5:16-235-

DCR, 2017 WL 4249546, at *7 (E.D. Ky. Sept. 25, 2017) (citing *Wathen*, 115 F.3d at 404 n.5),

*aff'd* (July 11, 2018). There is no dispute (or at least, there is a triable issue) that EMJ has a

disability, that he was harassed, or that (at least after the fact) Defendants knew of several alleged

events constituting harassment. The Court sees genuine factual disputes as to both the second and

third prongs.[7] Yet, because no reasonable juror could find that the Board was deliberately

indifferent to EMJ's plight, the Court declines extensive treatment of such elements.

Actionable deliberate indifference must, at a minimum, "cause [students] to undergo" or

"make them liable or vulnerable" to harassment. *Davis v. Monroe Cty. Bd. of Educ.*, 119 S. Ct.

1661, 1672 (1999).[8] Further, schools need not purge "their schools of actionable peer harassment"

to avoid liability. *Id.* at 1673. Nor are victims entitled to "particular remedial demands." *Id.* at

1674. "[C]ourts should not second guess the disciplinary decisions that school administrators

make." *Vance*, 231 F.3d at 260. However, "where a school district has knowledge that its remedial

action is inadequate and ineffective, it is required to take reasonable action in light of those

circumstances to eliminate the behavior." *Id.* at 261. The ultimate question is whether a defendant's

---

[7] The record probably contains sufficient proof to get EMJ to a jury on the harassment-disability nexus and severity/pervasiveness elements. Briefly, the alleged perpetrators' use of the slur "retard" likely creates a genuine dispute as to disability animus. *Cf. Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (rejecting, for summary judgment purposes, the idea that a member of a protected class is unlikely to discriminate against another class member). The Bathroom Incident, as now depicted by EMJ, surely establishes the same for harassment severity. *Cf. Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) ("[O]ne incident can satisfy" the severity requirement.).

[8] *Davis* is a Title IX case. *See id.* However, the Sixth Circuit and "the majority of federal district courts to have addressed the issue" have applied the *Davis* liability standard to "disability-based peer-on-peer harassment claims brought under the ADA and § 504[.]" *S.S.*, 532 F.3d at 453.

acts "or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 119 S. Ct. at 1674. With these principles in mind, the Court turns to the specific alleged incidents and the relevant school responses.

*Elementary School*

EMJ spent his 2014-15 & '15–'16 school years in Defendant Kim Young's 4th and 5th grade classes at Lancaster Elementary School. During this time, CD was EMJ's (sole) persecutor. *See* EMJ Dep. at 11–14, 16–18. EMJ claims that, during 4th grade, CD broke his backpack, threw a basketball at him, kicked his leg, and called him various expletives (including, as relevant to alleged disability discrimination, "dumbass"). *Id.* at 12–13. EMJ notified Ms. Young of only the name calling. *Id.* at 13. After the report, CD only cursed EMJ one other time that year. *Id.* Finally, CD punched EMJ in the neck, but after reporting alerted a non-defendant teacher (Ms. Yantz), CD never hit him again. *Id.* at 14.

During 5th grade, EMJ and CD argued in the lunchroom over Pokémon cards, and Ms. Young broke up the verbal dispute. *Id.* at 16. After, at Young's direction, EMJ and CD stopped bringing Pokémon cards to school. *Id.* at 16–17; Young Dep. at 28. CD also called EMJ expletives (including both "dumb ass" and "retard"). EMJ Dep. at 17. EMJ reported the cursing to Ms. Young; CD called EMJ names one other time. *Id.* CD opened EMJ's backpack and tore his binder in half. *Id.* at 18. EMJ reported the event to Ms. Young. *Id.* CD, for unknown reasons and with unknown results, got into EMJ's backpack one other time. *Id.* at 19. EMJ evidently did not report the singular post-intervention recurrences of CD's cursing or bag pilfering. *See id.* at 16–19. Finally, EMJ denied ever notifying Principal Bottoms of any of the elementary school events. *Id.* at 18.

In sum, during elementary school, CD harassed EMJ in several ways on, as best the Court can tell, six occasions during 4th grade, and five occasions in 5th grade. Of the three events that

involved physical contact, EMJ reported only one, the 4th grade punch in the neck, with the report going to non-defendant Yantz. CD never physically bullied[9] EMJ during 5th grade. EMJ's mother testified that she reported—to Belinda Bowling, Garrard County Director of Special Education— the earlier incident in which EMJ was hit with a basketball and generally picked on. DJ Dep. at 100. Bowling investigated and reported seeing nothing. *Id.*[10] Defendant Young testified that at the beginning of EMJ's 5th grade year, DJ generally suggested prior harassment and asked Ms. Young to prevent any continuation—DJ did not provide any specifics. Young Dep. at 25.[11] In sum, the record indicates that certain elementary school personnel were aware of *general* allegations that EMJ was being picked on, but nothing in the record suggests that any elementary school staff member was aware of more than one incident of CD physically harming EMJ.

*Middle School*

During the 2016-17 school year, EMJ had 6th grade classes with, among others, Defendant Brogli, a special education teacher at Garrard Middle School. Three new male classmates (JC, DM, and MS) soon targeted EMJ. EMJ Dep. at 19. It began as it did in elementary school, with the trio cursing EMJ (including calling him "retard"). *Id.* at 22. EMJ informed Ms. Brogli of the

---

[9] The Court, though cognizant of its plaintiff-favorable reading obligation, cannot view EMJ's narrative regarding the Pokémon dispute as depicting anything but a mutual verbal exchange. *See, e.g.*, EMJ Dep. at 16 ("we fought"; "we fight in the lunchroom . . . Ms. Young told us to stop" (emphasis added)). EMJ clearly knows how to describe a unilateral physical assault when he so intends. *See* EMJ Dep. at 14. Unlike the prior punching and kicking claims, EMJ—as to the Pokémon incident—does not allege that CD struck him. Young explicitly cast the event as a "verbal argument[,]" and nothing from EMJ's testimony contradicts. *See* Young Dep. at 27.

[10] DJ testified that she believed Ms. Bowling "would have seen" bullying. *Id.* Given DJ's testimony that she, personally, never witnessed EMJ being harassed and that EMJ testified to CD bullying him less than once a month, the Court cannot credit DJ's claim as anything more than speculation. DJ Dep. at 10. Notably, Plaintiff does not name Ms. Bowling as a defendant in this matter and offers no other proof as to her.

[11] Indeed, Young denied awareness of any problems between the boys **except** the Pokémon battle. *Id.* at 26–27.

contumely, but it did not stop. *Id.* at 23. Though, evidently, EMJ did not report any subsequent swearing.[12] DM and MS, EMJ's primary abusers, escalated their harassment in four subsequent events:

The Salad Incident—In the first and only cafeteria-based event, MS—at lunch—put orange juice, milk, ranch and ketchup into EMJ's salad and forced his head into the mixture. EMJ Dep. at 25–26. After, EMJ notified Ms. Brogli and Assistant Principal Lamb. *Id.* Per EMJ, neither Ms. Brogli or (though present) Ms. Lamb saw the incident. *Id.*

The Bathroom Incident—In the most appalling reported event, DM and MS assaulted EMJ in a restroom. *Id.* at 30–32. After climbing into EMJ's stall, MS reportedly pulled down his own pants, held EMJ's throat, touched EMJ's genitals, and kicked his knee while DM put a finger in EMJ's rectum. *Id.* A week later, DJ and EMJ met with Ms. Brogli. *See* DE 60-1 (2/14/17 Incident Report – describing events from "last Tuesday" and "Wednesday"). At that time, EMJ related several of the events he described at his deposition but, per the contemporaneous report and EMJ's testimony,[13] did not then report any rectal or genital contact. *See* DE 60-1 at 2;[14] EMJ Dep. at 33; Lamb Dep. at 47. Ms. Lamb, upon receiving the report, first had Ms. Brogli and the school counselor conduct interviews of individuals EMJ identified as involved or potentially nearby— from there, Lamb took over the investigation. Lamb Dep. at 39; DJ Dep. at 140. Lamb tracked

---

[12] EMJ described one of the name-callers, JC, as his best friend during the entire relevant period. *See, e.g.*, *id.* at 22.

[13] EMJ testified that he initially reported to Ms. Brogli that the boys had pinched his butt, hit his knee, and cursed at him. *Id.* at 33. EMJ is not clear about the timing of this conversation. However, in full record context, EMJ appears to be referencing a meeting from the next week. The complaint alleges that Plaintiff "did not tell anyone because" the perpetrators threatened him. DE 9 at ¶ 57. EMJ's deposition supports the threat claim. EMJ Dep. at 33. Ms. Brogli, as to receiving the report, specifically testified to asking EMJ: "why didn't you come to me sooner[?]" Brogli Dep. at 34.

[14] The Court notes potential, but unargued, hearsay concerns with this document. However, Plaintiff filed the document and the Court relies not on the truth of any asserted matters, but on events *not* alleged.

EMJ on school surveillance footage for the full school day on the dates he identified but could not locate any time when EMJ was in a bathroom with the alleged perpetrators. Lamb Dep. at 39–44. Lamb advised DJ of her inability to substantiate EMJ's claim and asked that she bring EMJ in to meet the following morning to check on possible alternative dates. *Id.* at 38. Lamb reviewed additional tapes as to multiple days. *Id.* at 41. Ultimately, Lamb was unable to find any footage showing that EMJ was ever in a bathroom with the alleged assailants in the period(s). Nonetheless, Lamb and Garrard developed a "plan for EMJ to be able to use a restroom in Ms. Brogli's [ ] classroom so that he could feel safe and comfortable having a spot to go in the building." *Id.* at 51. EMJ used Brogli's bathroom and no further restroom incidents occurred. EMJ Dep. at 30, 32–33.

The Pencil Incident—Next, months later, DM "tried" to put a pencil in EMJ's mouth during a non-defendant's (Ms. Atallah) social studies class. *Id.* at 34. EMJ reported the attempt to Lamb and Brogli. *Id.* at 35–36. Lamb then removed DM "from having any classes with EMJ[,]" and notified DJ of the event and the assigned consequences. Lamb Dep. at 81, 103.

The Kissing Incident—Finally, late in the year, MS threatened to beat up EMJ if he did not kiss a female classmate. EMJ Dep. at 39. Two non-defendant teachers were present (Ms. Atallah and Ms. Crowe) but EMJ did not know if they heard MS's threat. *Id.* at 39–40. EMJ, fearful, kissed the girl and ran away. *Id.*

After these events (on May 10, 2017), Dr. Manning-Courtney, EMJ's Developmental / Behavioral Pediatrician, advised that EMJ was experiencing stress "as a result of **recent** reported bullying." DE 60-3 (5/10/17 Letter) (emphasis added). Based on his pediatrician's

recommendation, DJ advised Ms. Lamb "that EMJ would not be returning to school for the remainder of the school year." Lamb Dep. at 103 ("She gave me a note from . . . Dr. Manning[.]").[15]

*Were the Board's Actions Clearly Unreasonable Under the Known Circumstances?*

Initially, the Court considers the proper factual field for the deliberate indifference analysis. The Court views the 4th and 5th grade incidents, though concerning, as insufficiently severe or pervasive to constitute independently actionable predicate conduct for EMJ's deliberate indifference claims. *Davis*, 119 S. Ct. at 1676 (The behavior must "be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity."). The

---

[15] Plaintiff's briefing is replete with additional conclusory claims. These are not evidence. Plaintiff repeatedly asserts facts without even attempting to cite record support. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record[.]"). Further, where Plaintiff does purport to cite the record, he mostly fails to tender the alleged underlying proof. [Facing the defense's reply claim that Plaintiff, when citing, mischaracterized the record, Plaintiff has not sought leave to sur-reply or tendered any contrary documentation.] Plaintiff, despite repeated references, has not filed a scintilla of "ARC meeting documentation" or a single deposition page. DE 60 at 3. It is telling, to the Court, that despite a roughly 12-month interval between Plaintiff's initial complaint and his summary judgment response (and, at counsel's request, a response deadline extension, *see* DE 58), Plaintiff was able to muster no more than **four pages** of proof specific to EMJ, *see* DE 60-1 to 60-3, in support of his claims. [Plaintiff does not cite his Rule 26 expert disclosures (DE 25), which, in any event, contain (admissible) proof only as to the alleged effects of the at-issue events.] At this Rule 56 stage, Plaintiff is entitled to a favorable reading of the *record*. However, the Court need not and does not accept counsel's unsubstantiated *theory* of the case. *See Wardle v. Lexington–Fayette Urban Cty. Gov't*, 45 F. App'x. 505, 509 (6th Cir. 2002) (per curiam) ("[A] district court is not required to search the record to determine whether genuine issues of material fact exist when the non-moving party has failed to point them out."); *Hinson v. Tecumseh Prod. Co.*, 234 F.3d 1268 (6th Cir. 2000) ("[C]onclusory allegations unsupported by specific evidence are insufficient to establish a genuine issue of material fact."); *see also Brenay v. Schartow*, 709 F. App'x 331, 336–37 (6th Cir. 2017) ("[W]hile it may be tempting to flesh out the parties' arguments for them, it is improper for the courts to do so.").

Moreover, to the extent Plaintiff attempts to supplant EMJ's recollection of the relevant events with DJ's recitation, he cites no hearsay exception. DJ clearly disclaimed any personal non-hearsay knowledge. *See* DJ Dep. at 3. Thus, the Court would "disregard" any such statements even if Plaintiff had produced them. *Gosbin v. Jefferson Cty. Commissioners*, 725 F. App'x 377, 388 (6th Cir. 2018) ("Plaintiff does not argue that the hearsay statements . . . qualify under any hearsay exception, so we disregard those statements."). The Court's summary of the relevant events reflects these principles.

question remains, however, what impact (if any) should they have had on the Board's subsequent handling of EMJ? Certainly, there are circumstances where elementary school bullying, though not alone actionably severe or pervasive, would inform a reasonableness inquiry for subsequent more dire events. *See, e.g.*, *Vance*, 231 F.3d at 261 ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."). During 6th grade, as here alleged, events for EMJ took a dark and cruel turn. However, CD (the sole alleged primary-school tormentor) was no longer EMJ's classmate during middle school. Further, the only Defendant[16] with knowledge of any specific prior events, Young, was no longer teaching EMJ.[17] Thus, as the Court sees it, nothing about any successes or failures in responding to 4th and 5th grade incidents could have (or did) put Garrard on notice as to potential efficacy of efforts regarding a completely new bully cohort.

In sum, it is not clear what, if anything, middle school officials knew about CD bullying EMJ. Regardless, a jury could not reasonably rely on any such knowledge as proof that Garrard was deliberately indifferent to EMJ's middle school welfare. CD did not matriculate with, and thus

---

[16] Non-defendant Bowling allegedly received a single report of one specific incident and a general allegation of bullying. She investigated, but her observations did not corroborate the report. There is no evidence she had actual knowledge of any severe or pervasive bullying. Again, and whatever actual knowledge Bowling had, elementary school graduation ended EMJ's problems with CD. There is no proof from Bowling in the record.

[17] Indeed, the record contains slim proof that any middle school official with "authority to address alleged discrimination and to institute corrective measures on the [Board's] behalf" had knowledge of the elementary school specifics. *C. K. v. Wrye*, 751 F. App'x 179, 183 (3d Cir. 2018). D.J. reports generally notifying Ms. Bottoms, during an elementary school ARC committee meeting, that EMJ was being bullied. DJ Dep. at 12. Thus, giving Plaintiff an appropriately favorable reading, the Court assumes that some record of this general report was in EMJ's middle school file. Nonetheless, the reporting record is too thin to impute knowledge of elementary school specifics to any middle school personnel. *See* DJ Dep. at 79 (discussing absence of notation regarding bullying in ARC notes).

no longer presented any risk to EMJ. Further, DM and MS's subsequent maltreatment, save the verbal slurs, differed in kind and degree. Accordingly, the Court limits its deliberate indifference examination to the middle school events.

The Court, conscious of the deliberate indifference rubric's fourth step, next considers what Garrard knew and when it knew it. "[T]he propriety of the [Board's] response is measured by the known circumstances[.]"). *See McCoy v. Bd. of Educ., Columbus City Sch.*, 515 F. App'x 387, 392 (6th Cir. 2013). Thus, timing and content are keys.

Prior to the Salad Incident, Garrard officials, at most, knew that MS, DM, and JC had cursed at EMJ once. The school had no prior evidence that the trio posed a physical threat. Though unobserved by any official, after the cafeteria report, Garrard knew that MS (the sole identified actor) might pose a minor threat to EMJ. The Salad Incident, though cruel and sophomoric, carried no discernable sexual connotation. Prior to the worst of the alleged conduct, the Bathroom Incident, Garrard knew that one repeat offender, MS, had once (1) verbally disparaged EMJ and (2) pushed his head into a salad concoction in the cafeteria. Two events, one solely verbal, do not amount to "pervasive" harassment. *S.S.*, 532 F.3d at 445; *Davis*, 119 S. Ct. 1675 ("Damages are not available for simple acts of . . . name-calling among school children," even if discriminatory.) Nor was either incident sufficiently "severe [ ] and objectively offensive" enough to undermine EMJ's educational[18] experience. *Davis*, 119 S. Ct. at 1675; *id.* ("Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults."). If the record ended here, Garrard surely would not be liable. *Id.* at 1673–74 (The deliberate indifference standard "does not mean that

---

[18] The record reveals no *in-class* middle school bullying until after the Bathroom Incident.

recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action.").

This matters because one incident of name-calling and one event that ostensibly caused EMJ no bodily harm is all Garrard knew before matters escalated. Remember: "the proportionality of the school's response in light of available information lies at the heart of the indifference analysis." *McCoy v. Bd. of Educ., Columbus City Sch.*, 515 F. App'x 387, 391 (6th Cir. 2013). As the Court sees it, no reasonable juror could find that the prior incidents, alone or in combination, were sufficient to portend something as strikingly abhorrent as the described Bathroom Incident. *Cf. Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 117 S. Ct. 1382, 1391 (1997) ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a **known** or **obvious** consequence[.]" (emphasis added)). Put differently, Garrard, based on its post-Salad Incident knowledge, had no basis to take the type of steps that might have prevented the alleged Bathroom Incident, *e.g.*, ensuring no MS-EMJ contact or allowing EMJ to use a private bathroom. Thus, no reasonable decider could find that Garrard's conduct prior to the Bathroom Incident caused or placed EMJ at risk for the restroom events. *Davis*, 119 S. Ct. at 1672 (Deliberate indifference, at minimum, must "cause [students] to undergo" or "make them liable or vulnerable" to harassment.). Thus, Garrard, prior to the assault, was not deliberately indifferent to severe peer harassment.

After the Bathroom Incident, neither DJ or EMJ reported anything initially, and they ultimately advised Garrard of a lesser (though severe) version. Specifically, EMJ did not report any genital or rectal physical contact. Confronting the truncated facts, Lamb investigated. Despite the resulting absence of evidence to corroborate EMJ's claims, Garrard responded by employing a system that successfully eliminated any possibility of a repeat bathroom issue. *See Patterson v.*

*Hudson Area Sch.*, 551 F.3d 438, 449 (6th Cir. 2009) (approvingly noting a school system's provision of a "resource room during eighth grade" as having "worked to insulate [a victim] from [ ] harassment"). EMJ's use of Brogli's bathroom worked to prevent any like attacks. Nothing about Garrard's response to the Bathroom Incident suggests it was deliberately indifferent to EMJ's plight.

As soon as staff learned—via the Pencil Incident—that one of the Bathroom Incident accused had further interactions of concern, Garrard, again, took action. Lamb cut off the relevant assailant's (DM) contact with EMJ permanently. Thus, Garrard, upon finding that its bathroom plans were "ineffective" to fully halt DM's harassment did not "continue[ ] to use those same methods to no avail[.]" *Vance*, 231 F.3d at 261. Finally, after the Kissing Incident, which involved no physical harassment (against EMJ), Lamb investigated, assigned consequences, and notified DJ. The record shows no further incidents.

In sum, based on Garrard's knowledge at each relevant stage, the Court finds no proof of clearly unreasonable responses. Plaintiff simply fails to identify any (and the Court sees no) steps

that Garrard failed to take that subjected or placed EMJ at further risk for severe harassment.[19] As the Sixth Circuit has said in analogous circumstances:

> Even viewing the record in the light most favorable to S.S., proof is lacking as to what Model could have or should have done differently in order to bring the peer-on-peer harassment to a stop. The record in this case does not give rise to an inference that Model was deliberately indifferent to S.S.'s situation or that it had an attitude of permissiveness that amounted to discrimination.

*S.S.*, 532 F.3d at 455–56. So too here. "[T]he known circumstances were sparse; prior to [the Bathroom Incident], the [Board] was made aware of" only one instance "of physical contact that w[as] ostensibly non-sexual" and could not "have served as [a] potential indic[ator] for sexual malfeasance." *McCoy*, 515 F. App'x at 392. The only "time [EMJ] or his mother communicated a **specific** complaint of harassment, the school investigated promptly and thoroughly[.]" *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 849 (6th Cir. 2016) (emphasis added). Once officials learned "of the incidents, they quickly and effectively corrected the situation." *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999). On these facts, the Court finds that Plaintiff failed to

---

[19] In truth, Plaintiff mostly faults Defendants for only one specific omission: failing to report the Bathroom Incident pursuant to KRS 158.156. DE 60 at 12. However, Plaintiff's argument on this point is deficient for a host of reasons. First, EMJ claims Garrard had a duty to report a KRS 510.110 violation, but the reporting statute, KRS 158.156, only mandates reporting for felonies "specified in KRS Chapter 508[.]" DE 60 at 12. Second, Plaintiff ignores EMJ's testimony that he initially reported that the bathroom assailants only contacted him physically by pinching his butt and kicking his leg. Third, Kentucky law is clear that when, as here, the school official has "no actual knowledge of the event, there must be an objective determination that a reasonable belief existed." *Turner v. Nelson*, 342 S.W.3d 866, 877 (Ky. 2011). Plaintiff has shown, at most, that Lamb had a wholly unsubstantiated report of butt-pinching, leg-kicking, and genital exposure. Plaintiff's parents and physician, evidently on notice of the alleged events, filed no report. Ultimately, Plaintiff's failure to identify a felony subject to the KRS 158.156 reporting requirement is alone sufficient to defeat this theory. Even if it were not, Plaintiff makes no argument to satisfy *Turner*'s objective "reasonable belief" standard on these facts. EMJ cannot show that Garrard had actual knowledge of felony conduct, and Plaintiff's (uncorroborated) allegations of regulatory violations do not constitute deliberate indifference. *Gebser v. Lago Vista Indep. Sch. Dist.*, 118 S. Ct. 1989, 2000 (1998) (School district's "alleged failure to comply with [DOE] regulations" did not "establish the requisite actual notice and deliberate indifference."). Lamb painstakingly reviewed video and rationally concluded that the alleged players were not in the room together.

show any triable dispute as to whether Garrard's responses to known events was clearly unreasonable.[20] This ends the § 504 and KRS Chapter 344 inquiry.

### B. 42 U.S.C. § 1983

To survive summary judgment on his § 1983 claims, EMJ must "marshal evidence that could establish two elements: (1) deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008). Plaintiff claims he has adequately alleged facts to support § 1983 claims for Fourteenth Amendment equal protection and due process violations. DE 60 at 12. [Neither EMJ's original (DE 1-1) or amended complaint (DE 9) mentions the words "due process."][21] Though neither Plaintiff's complaint or briefing is entirely clear on the point, it appears EMJ is claiming a state-created property interest in "an appropriate safe school environment." DE 60 at 12; *id.* at 13 (Plaintiff claims he has "alleged a sort of intentional

---

[20] The Court notes one final factor, unaddressed by the parties. EMJ identified DM and MS as the Bathroom Incident perpetrators. *See* EMJ Dep. at 31. The parties' briefing accepted this recitation as controlling. DE 53 at 5; DE 60 at 4–5. However, Lamb testified that the report EMJ originally provided named DM, JC, and KB as the attackers. *See* Lamb Dep. at 43. The written, temporally closer report supports Lamb's version (at least as to the unredacted KB; the remaining report-identified assailants are fully redacted). *See* DE 60-1. Ultimately, the disparity in accounts has, at most, a minor impact on the Court's analysis.

The disparity is mostly relevant to the clarity of EMJ's memory. Yet, the Court's role at this stage does not encompass credibility assessments. Thus, the Court, here, accepts the deposition version of the Bathroom Incident *conduct*. Nonetheless, the additional disparity (actors, on top of conduct described) in the original *report* bolsters the general idea that EMJ (and DJ) initially provided a substantially different narrative from the recitation Plaintiff now relies on (and which the Court, for current purposes, accepts as the true events, despite the initial faulty report).

[21] In similar circumstances—*i.e.*, where a theory related to, but distinct from complaint allegations was "argued for the first time" in response to a summary judgment motion—the Sixth Circuit approvingly noted a district court's rejection of an insufficiently pleaded claim. *See Ways v. Miami Univ. of Ohio*, 604 F. App'x 445, 447 (6th Cir. 2015) ("The district court rejected Ways's argument that she had adequately pleaded a hostile-work-environment claim. Were we asked to review that ruling, we would affirm."). Plaintiff's failure to adequately plead a substantive or procedural due process claim applies as an alternative basis for the Court's dismissal of these theories.

discrimination against what KRS 344.130 protects."); KRS 344.130 (defining "place of public accommodation, resort, or amusement"); *see also* KRS 157.195 ("The General Assembly declares that all students of the Commonwealth have a right to an appropriate and quality education in the public schools[.]").[22]

"While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the [federal] Constitution." *Charles v. Baesler*, 910 F.2d 1349, 1354 (6th Cir. 1990) (quoting *Regents of the Univ. of Mich. v. Ewing*, 106 S. Ct. 507, 515 (1985) (Powell, J., concurring)). Plaintiff evidently bases his due process claim on state law. *See* DE 60 at 12 (The Commonwealth "has adopted a statutory scheme to protect students from being victims of bullying and/or harassment." (citing KRS 158.148)); *id.* at 13 (claiming to allege "a sort of intentional

---

[22] Plaintiff does not allege that Defendants violated EMJ's Fourteenth Amendment "liberty interest in freedom from bodily injury." *Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 506 (6th Cir. 1996) (citation omitted). He also does not identify any "policy" or "custom" as a valid claim of this type would require. *Id.* at 507. EMJ also does not invoke a "state-created danger" theory, which renders government liable for injuries committed by a private person if: "(1) an affirmative act by the governmental actor either created or increased the risk that the plaintiff would be exposed to the injurious conduct of the private person; (2) the governmental actor's act especially endangered the plaintiff or a small class of which the plaintiff was a member; and (3) the governmental actor had the requisite degree of culpability." *Hunt*, 542 F.3d at 534. Plaintiff claims no affirmative Defendant misconduct. Indeed, DJ explicitly denied that any Defendant personally mistreated EMJ. *See* D.J. Dep. at 27. Plaintiff, alleging no affirmative maltreatment and proving no deliberate indifference, likewise failed to satisfy the third "state-created danger" prong. *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 469 (6th Cir. 2006) ("The government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense[.]" (citation and internal quotation marks omitted)). Thus, Plaintiff claims no exception to the general rule "that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 109 S. Ct. 998, 1004 (1989). [This rule is not abrogated simply because a state actor is subject to state law duties: "A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not all common-law duties owed by government actors were constitutionalized by the Fourteenth Amendment." *Id.* at 1007 (citation and quotation marks omitted).]

discrimination against what KRS 344.130 protects."). Such "areas in which substantive rights are created only by state law . . . are not subject to substantive due process protection under the Due Process Clause[.]" *Young v. Twp. of Green Oak*, 471 F.3d 674, 684 (6th Cir. 2006).

Put simply, EMJ's due process claim, premised on state law, is only actionable on procedural—not substantive—grounds. Thus, assuming *arguendo* that the state created an interest "in an appropriate safe school environment" EMJ needed to show "(1) that he was deprived of [such] . . . interest, and (2) that such deprivation occurred without the requisite due process of law." *Pittman v. Cuyahoga Cty. Dept. of Children and Family Services*, 640 F.3d 716, 729 (6th Cir. 2011) (internal citations and quotation marks omitted). Yet, Plaintiff does not claim that Defendants failed to give him an "*opportunity* to be heard at a meaningful time and a meaningful manner." *Mathews v. Eldridge*, 96 S. Ct. 893, 902 (1976). Stated otherwise, EMJ does not allege that Defendants denied him the "fundamental requirement of due process[.]" *Id.* Thus, no reasonable jury could find for EMJ on the lone due process theory.

EMJ, "to demonstrate a violation of the Fourteenth Amendment's Equal Protection Clause," needed to establish "Defendants' [disability-linked] discriminatory intent with respect to their response to the student on student harassment." *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 618 (6th Cir. 2012) (citation omitted). "The Sixth Circuit recognizes two methods of proving an equal protection violation based on a school official's response to peer harassment: (1) disparate treatment of one class of students who complain about bullying as compared to other classes of students, . . . and (2) deliberate indifference to discriminatory peer harassment[.]" *Stiles*, 819 F.3d at 851–52 (citations omitted).[23] Plaintiff advances no disparate treatment theory (and

---

[23] Circuit law is quite clear on the availability of a deliberate indifference theory in this scenario. Thus, the Court analyzes the claim. However, the Court notes that the Circuit development is arguably inconsistent with Supreme Court precedent:

identifies no relevant comparator). His deliberate indifference theory, subject to the same standard as his § 504 theory, fails for the reasons already explained. *See id.* ("[T]he plaintiff must offer evidence that school officials responded to [ ] discriminatory peer harassment . . . in a manner clearly unreasonable in light of known circumstances."). Because Plaintiff could not prevail on his due process or equal protection claim, Defendants are entitled to summary judgment on Count II.

### C. Negligence

Finally, the Court turns to EMJ's state-law negligence theory. At the outset, the Court notes that EMJ concedes the Board's immunity to his state tort claim. *See* DE 60 at 7; *Yanero v. Davis*, 65 S.W.3d 510, 527 (Ky. 2001) ("A local board of education is . . . entitled to governmental immunity[.]"). Because, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity[,]" the same immunity stretches to any intended negligence claims against the individual Defendants in their official capacities. *Graham*, 105 S. Ct. at 3105. Thus, the Court examines the substantive merit only of the individual capacity claims asserted against Defendants Bottoms, Brogli, Lamb, Keith, and Young. *See* DE 9 at ¶¶ 81–86.[24]

---

Even where particular activities and particular defendants are subject to both Title IX and the Equal Protection Clause, the standards for establishing liability may not be wholly congruent. For example, a Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference. . . . A plaintiff stating a similar claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the harassment was the result of municipal custom, policy, or practice.

*Fitzgerald v. Barnstable Sch. Comm.*, 129 S. Ct. 788, 797 (2009) (citations omitted); *see also Hill v. Cundiff*, 797 F.3d 948, 976–77 (11th Cir. 2015) (applying *Fitzgerald* and holding that the "evidence must show the deprivation of the constitutional right is a 'plainly obvious consequence' of the municipal action" (citation omitted)).

[24] The Court disregards Plaintiff's negligence allegations against certain "unknown Defendants[.]" *Id.* The Complaint does not name (and Plaintiff has not pursued service on) any "Doe" defendants.

A Kentucky negligence claim requires a plaintiff to show "that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). Triggering an affirmative defense to the negligence theory, Defendants specifically claim qualified official immunity. *Yanero*, 65 S.W.3d at 522 (Qualified immunity "must be specifically pled."). This limited defense provides a safe harbor for "public officers and employees" when "sued in their individual capacities . . . for good faith judgment calls made in a legally uncertain environment." *Id.* The Commonwealth's highest court provides the doctrinal framework:

> Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, . . . ; (2) in good faith; and (3) within the scope of the employee's authority. . . . An act is not necessarily "discretionary" just because the officer performing it has some discretion with respect to the means or method to be employed. . . .

> Conversely, an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts. . . . "That a necessity may exist for the ascertainment of those facts does not operate to convert the act into one discretionary in nature."

*Id.* (citations omitted). Thus, the Court must determine whether the Defendants' alleged acts were ministerial acts, subject to negligence analysis, or discretionary tasks, subject only to bad faith examination. *Id.* at 523 (For qualified immunity purposes "'bad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.").

"The distinction between discretionary acts and mandatory acts is essentially the difference between making higher-level decisions and giving orders to effectuate those decisions, and simply following orders." *Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014). In the context of student supervision, Kentucky draws a line between school administrators and teachers. "Because [the] task is so situation specific, and because it requires judgment rather than a fixed, routine performance, looking out for children's safety is a discretionary function for a principal[.]" *Id.* at 299; *but see id.* (recognizing that "specific instructions could make such duties required and thus ministerial."). On the other hand, "a teacher's duty to supervise students is ministerial, as it requires enforcement of known rules." *Id.* at 301. Although in the course of a ministerial or discretionary task "unexpected events [may] occur" it is the nature of the official's acts or omissions, rather than third party conduct, that "determines whether they are discretionary or ministerial." *Id.* at 302.

The Court first determines whether each individual Defendant's at-issue conduct was discretionary or ministerial.[25] Finally, the Court considers whether any Defendant performed discretionary duties in bad faith or, as a triable issue, carried out ministerial responsibilities negligently.

---

[25] The Court notes that Plaintiff entirely failed to confront Defendants' claims that all relevant acts were discretionary. *See* DE 53 at 23. Indeed, Plaintiff's qualified immunity analysis, largely focused on a federal model, only addresses one route of showing bad faith for discretionary conduct. *See, e.g.*, DE 60 at 17 ("Immunity does not protect individuals who violate clearly established law or policy."). Further, Plaintiff specifically questions acts of only two named Defendants: Young and Lamb. DE 60 at 17. Accordingly, the Court is inclined to consider any question of ministerial conduct waived. However, given qualified immunity's affirmative defense status, the Court generally analyzes whether the defense's theory of wholly discretionary conduct is contrary to state law.

*Ministerial / Discretionary Duties*

As to Superintendent Keith, Principal Bottoms and Assistant Principal Lamb, the Court sees no record proof, *e.g.* "specific instructions[,]" that would justify a departure from Kentucky's general rule for supervisory officials that "looking out for children's safety is a discretionary function[.]" *Marson*, 438 S.W.3d at 299. Regarding Keith—who was not a relevant official until EMJ's middle school year, Keith Dep. at 2—and Bottoms, Plaintiff provides no proof of **any** specific supervisory involvement over EMJ. Bottoms was a member of EMJ's ARC committee, and EMJ's parents advised Keith of the Bathroom Incident. The Court, in case context, sees nothing about Bottoms's ARC role or Keith's receipt of a report that triggered any "absolute, certain, and imperative [duty], involving merely execution of a specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522. EMJ denied ever informing Bottoms of any specific incidents. EMJ Dep. at 18. As to Keith, neither Plaintiff's already-rejected statutory theory or Garrard policy[26] converted Keith's otherwise discretionary responsibilities upon report receipt into a mandatory ministerial duty. In short, the record shows that Keith and Bottoms had no duty more specific than their general responsibility to "provide a safe school environment," which, as to Kentucky school administrators, "is a discretionary function[.]" *Marson*, 438 S.W.3d at 299.

Lamb presents a slightly different analysis for one event: The Salad Incident. In her role as a cafeteria monitor that day, Lamb was arguably acting as a policy enforcer, rather than policymaker. *See Patton v. Bickford*, 529 S.W.3d 717, 727 (Ky. 2016) ("Administrators are a degree removed from the actual execution of the policies. Instead, their role is to monitor the

---

[26] The relevant policies provide general, rather than specific instructions and do not purport to apply to a superintendent. *See, e.g.*, DE 60-4 at 4 (indicating that a **principal** or designee who receives a bullying report "should **investigate and address** alleged incidents[.]" (emphasis added)).

implementation of the policies and react as needed."). Yet, EMJ does not make this argument, and, in a strikingly similar scenario, Kentucky's highest court held that an administrator—though, "at times" helping "to monitor the cafeteria during lunchtime"—did not have a "specific supervision" role, but only "a general supervisory duty over the students." *Id.* Thus, Lamb, like Bickford, is on the discretionary side for qualified immunity. *See id.* The same is true for Plaintiff's complaints about Lamb's investigation: in Kentucky "investigation of potential abuse" is a discretionary act. *Ritchie v. Turner*, 559 S.W.3d 822, 840 (Ky. 2018).

For Brogli and Young, as teachers, their supervisory duty was generally "ministerial, as it require[d] enforcement of known rules." *Marson*, 438 S.W.3d at 301. However, Kentucky recognizes an exception for officials that "were not actually involved in active supervision of the students at the times relevant to [the] complaint." *Ritchie*, 559 S.W.3d at 832; *see also id.* at 829 n.12 (noting that one of the named defendants was a teacher). In such circumstances, only a general "discretionary . . . supervisory duty" applies. *Id.* at 832. Plaintiff, as to immunity, broadly claims violations of statutory or policy obligations and, specific to Young, alleges:

> [T]he child's mother expressed concern to Defendant Young about the child being bullied. The Defendant Young took NO action to protect the child from further bullying.

DE 60 at 17. Again, Kentucky has held that "investigation of potential abuse" is a discretionary act. *Ritchie*, 559 S.W.3d at 840. If EMJ's claim is based on a failure to supervise, the record reveals only one incident where Young arguably had a direct supervisory duty over EMJ: the Pokémon argument. Plaintiff does not dispute Defendants' record-backed contention that CD was not Young's student. Young Dep. at 22. Most of the relevant events occurred when EMJ was in other teachers' classes, *see* EMJ Dep. at 14 (neck punch), or in common areas. *See, e.g.*, *id.* at 16 (Pokémon argument on the playground); Young Dep. at 25 (backpack "destroyed in the gym").

There is no proof that Young generally had active supervisory responsibilities over any of these areas or over EMJ during the pertinent episodes. *See* Young Dep. at 27 ("I'm not on the playground . . . I have other duties."). The sole exception, for the Pokémon incident, applies because Young was present when EMJ and CD "were coming back from the playground[.]" *Id.* Since Young was then "actually supervising the students" her duty was, viewing the facts in an EMJ-favorable light, arguably "ministerial[.]" *Ritchie*, 559 S.W.3d at 832. The Court thus analyzes this discrete event under the negligence rubric.

Plaintiff does not specifically challenge Defendant Brogli's entitlement to qualified immunity. And rightly so. There is no proof that Ms. Brogli was present for any of the alleged bullying. Brogli was not in the cafeteria during the Salad Incident. EMJ Dep. at 26. The Pencil and Kissing Incidents occurred in other (non-defendant) teachers' classes. *Id.* at 34, 39–40. Obviously, no teachers were present for the bathroom events. Simply put, the record shows that Brogli, as to the complaint events, had at most a general, discretionary supervisory duty.

To the extent EMJ premises his claims against Brogli and Young on Board-established reporting policy, he shows no applicable ministerial duties. Garrard policies required reports in various circumstances, *e.g.*, if "a student . . . has been subject to harassment" or in situations "that threaten, harass, or endanger the safety of students" including "bullying[.]" DE 60-5 at 3–4. However, read in context, most of the bullying-tied reporting mandates require personal knowledge as a trigger. *Id.* Generally, the Garrard reporting protocols either (A) explicitly set a lower threshold/specific prompt or (B) are scenarios where personal knowledge is an obvious

predicate.[27] Of the requirements relevant here, most fall into the latter category, and are thus inapplicable to Brogli or Young. There is one exception: the requirement for employees who "know or have reasonable cause to believe" a KRS 158.156-reportable violation occurred. *See* DE 60-5 at 4. Yet, Kentucky law is clear that reporting duties activated by a teacher's "reasonable cause to believe" are, in the absence of personal knowledge, dominantly "discretionary in nature[.]" *Ritchie*, 559 S.W.3d at 837 ("[W]ithout one having actual or personal knowledge of abuse, the ultimate determination of whether reasonable cause exists involves reasonable inquiry into the facts, weighing credibility of witnesses, and then using judgment and experience to reach a decision."). In sum, EMJ failed to show that Brogli or Young (or Lamb/Keith) had personal knowledge[28] of events that would spring any of Garrard's ministerial reporting duties or convert "reasonable cause to believe" reporting requirements into non-discretionary obligations.

*Bad Faith*

Plaintiff does not dispute (and the record supports) Defendants' claim that, at all relevant times, they "acted within the scope of their authority." DE 53 at 25; *see* DE 60 at 16–18. Thus, for the Defendants' discretionary conduct, "the burden shifts to [EMJ] to establish by direct or

---

[27] *Compare* DE 60-5 at 3–4 ("Within seventy-two (72) hours of the discovery or notification of a security breach"); ("If you know or believe"); ("Upon the request of a victim"); ("If you suspect that financial fraud"); ("When notified of a bomb threat"); ("If you know or believe that the District's weapon policy has been violated"); ("District employees who know or have reasonable cause to believe"), *with id.* ("Report to the immediate supervisor damaged lost, stolen, or vandalized school property"); ("Report potential safety or security hazards to the Principal and notify your supervisor immediately after sustaining a work-related injury or accident."); ("Report to the Principal any student who is missing during or after a fire[.]"); ("District bus drivers taking medication . . . shall report"); ("Notify the Principal as soon as possible when you use seclusion or physical restraint with a student[.]"); ("Report to the Principal any threats you receive[.]").

[28] Excepting Young's witnessing of the Pokémon-card argument, which, as explained, was a mutual verbal disagreement. Further, given Young's response to that event, it would not qualify as "bullying" under Board policy. *See* DE 60-5 at 2 (requiring conduct that "is repeated or has the potential to be repeated").

circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523.

> Bad faith can be predicated on a violation of a causally related constitutional, statutory, or other clearly established right which a person in a public employee's position presumptively would have known was afforded to a person in the plaintiff's position or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.

*Rowan County v. Sloas,* 201 S.W.3d 469, 475 (Ky. 2006) (quoting *Yanero,* 65 S.W.3d at 523). As the Court has thoroughly explained, Plaintiff has not proven a violation of any constitutional or statutory right.[29] Plaintiff does not claim (and the record does not even suggest) that any "school officials willfully or maliciously intended to harm [him] or acted with a corrupt motive." *Ritchie*, 559 S.W.3d at 844. Thus, EMJ failed to carry his burden at the bad faith stage and cannot deprive any Defendant of qualified immunity for their discretionary acts.

---

[29] Though Plaintiff does not peg his arguments to any particular right, the Court briefly addresses EMJ's specific bad faith claims (at least to the extent EMJ attempts, or the Court can find, any record linkage). EMJ claims Young took "NO action to protect" EMJ after DJ reported bullying; the Court sees no bad faith. *See* DE 60 at 17. In the 4th grade, DJ advised Young, after the fact, that CD destroyed EMJ's backpack in the gym. Young Dep. at 25. At the beginning of 5th grade, DJ generally advised Young of prior bullying but failed to provide "detail . . . of who [Young] was supposed to keep [EMJ] away from[.]" *Id.* Young testified that she *never* saw EMJ being bullied, but did see the Pokémon-sparked conflict with CD. *Id.* at 26. Young immediately responded, advised EMJ's parents, and as to both children banned the items that catalyzed the dispute. *Id.* at 28.

EMJ also theorizes that Lamb's investigation of the Bathroom Incident was in bad faith. DE 60 at 17. As far as EMJ relies on his rejected reporting-requirement claim, the bad faith iteration fails for the reasons already discussed. The balance of Plaintiff's bad-faith analysis consists of a recitation of Lamb's thorough investigation. *See* DE 60 at 17. He fails to explain why Lamb's diligent efforts amount to proof of bad faith. The only additional step that EMJ suggests Lamb should have taken is to discuss the events with Brogli. *See* DE 60 at 18. The record shows that Lamb did just that. *See* Lamb Dep. at 39, 51–52; *see also* DE 60-1 (Incident Report "[g]iven to . . . Lamb"). In sum, EMJ points to no proof of any clearly established legal violation.

*Negligence*

As to the Pokémon dispute, Young clearly had a duty. *Williams v. Kentucky Dep't of Educ.*, 113 S.W.3d 145, 148 (Ky. 2003) ("The 'special relationship' . . . between a school district and its students imposes an affirmative duty on the district, its faculty, and its administrators to take all reasonable steps to prevent foreseeable harm to its students."). That said, the Court, even construing the record in EMJ's favor, finds that no reasonable jury could find that Young, in reacting to the Pokémon dispute, breached that duty. The dispute was, as EMJ described it, a mutual conflict, not "Bullying" as Garrard defined the term. *See* DE 60-5 at 2 (acts involving "a real or perceived power imbalance and **is repeated or has the potential to be repeated**"); EMJ Dep. at 16 ("[W]e fought" because CD thought "his part" [of the Pokemon book was] much better"); *id.* ("we fight"); *id.* at 17 (EMJ stopped bringing his Pokémon cards to school after Ms. Young stopped the argument). The argument began on the playground, and Young stopped it seemingly as soon as her duty was triggered, *i.e.*, when she began supervising EMJ and CD. Plaintiff claims no recurrence. On this record, and though affording Plaintiff's factual claims due deference, the Court finds that it would be "unreasonable for a jury to find breach[.]" *Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 916 (Ky. 2013); *see id.* at 916 n.58 ("Sometimes reasonable minds cannot differ about whether an actor exercised reasonable care . . . . In such cases, courts take the question of negligence away from the jury and determine that the party was or was not negligent as a matter of law." (quoting Restatement (Third) of Torts: Phys. & Emot. Harm § 7 cmt. *l* (2010)).

Alternatively, even if there was some minor breach (and the Court sees none), EMJ fails to show that any Young act or omission harmed EMJ.[30] Indeed, as to this discrete event, Plaintiff shows no damages of any kind. Plaintiff generally claims "emotional distress, embarrassment and humiliation." DE 9 at 12. Thus, Plaintiff's negligence theory (at least for any non-physical bullying) is, at bottom, an NIED claim. For such claims, based purely on alleged emotional injury, "[d]istress that does not significantly affect the [plaintiff's] everyday life or require significant treatment will not suffice. And a plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment." *Osborne v. Keeney*, 399 S.W.3d 1, 17–18 (Ky. 2012); *see also MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015) (*Keeney*'s expert testimony requirement applies to NIED & IIED.). Plaintiff presents no affirmative evidence "concerning any severe emotional distress" Young (or CD) caused. *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 545 (Ky. Ct. App. 2013).[31] This "failure [is also] fatal to" the negligence claim. *Id.*

---

[30] "Causation consists of two distinct components: 'but-for' causation, also referred to as causation in fact, and proximate causation." *Patton*, 529 S.W.3d at 730. The former, a factual inquiry normally reserved to a jury, requires "deciding if the defendant's conduct was a 'substantial factor' in causing" the alleged injury. *Id.* The latter, a legal question for the courts, necessitates assessment of whether a breach, though factually causing an injury, "is nevertheless too attenuated from the damages in time, place, or foreseeability to reasonably impose liability upon the defendant." *Id.* at 731. Plaintiff fails to explain how any deficient Young supervision led to any specific EMJ harms. To the extent that EMJ seeks to link any Young breach in supervising CD and EMJ to the subsequent grave middle school events, the Court finds, as a matter of law, no proximate causal link. The middle school events concerned an entirely different student group and included conduct different in kind and severity. The scope of the risk created by deficiently supervising a verbal dispute, of this stripe, simply does not include temporally distant third-party sexual misconduct.

[31] Plaintiff presents some expert proof concerning emotional damages in physician reports. *See* DE 60-3 at 1; *see also* DE 25-3 (Rule 26(a)(2) disclosures). But, the subject 2017 documentation concerns "stress" EMJ was "experiencing as a result of **recent reported** bullying[.]" *Id.* In record context, the Pokémon card incident, occurring a year prior and involving a different child at a different school, was clearly not the subject of Dr. Manning-Courtney's letter. The elementary school events were not recent and would make little logical sense as the basis for the pediatrician's ultimate recommendation that EMJ be removed from middle school. *See id.* The Court reaches the

In sum, Young, at the only time a relevant duty pertained, swiftly and fastidiously acted to protect the involved students. EMJ alleges no neglectful omissions on Young's part, *i.e.*, Plaintiff fails to explain how a reasonable teacher might have acted differently. The record also lacks proof of a nexus between Young acts (or inaction) and actionable injury. Plaintiff, presenting no proof to create a triable issue on the breach or damages elements of his negligence claim, failed to clear the Rule 56 hurdle. Defendant Young is, thus, entitled to judgment as a matter of law on the state-law claim.

## IV.        CONCLUSION[32]

For these reasons the Court **GRANTS** DE 53[33] and **ORDERS** as follows:

1. The Court **DIRECTS** the Clerk to **SEAL** DE 60-1 and DE 25-6 as each contain unredacted identifying information regarding the minor Plaintiff;

2. The Court **DIRECTS** the Clerk to file the attached redacted versions of DE 60-1 and DE 25-6 as exhibits to this Opinion & Order;

3. Given the result, the Court **DENIES** Defendant's Motion in Limine (DE 50) **AS MOOT**; and

4. The Court will enter a separate Judgment.

This the 11th day of September, 2019.

Signed By:

*Robert E. Wier*

**United States District Judge**

---

same conclusion regarding Social Worker Kay Hubbard's reports as to "post-traumatic stress symptoms," which Hubbard explicitly links to events "during the 2016-2017 academic school year." *See, e.g.*, DE 25-3 at 1.
[32] Given the result, the Court declines a merits analysis of Defendants' Coverdell Immunity claim. *See* DE 53 at 19.
[33] The Court does not need oral argument in this case, so denies the defense request.